UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CONNECTICUT FAIR HOUSING
CENTER,
    *Plaintiff*,

v.

U.S. DEPARTMENT OF HOUSING
AND URBAN DEVELOPMENT,
    *Defendant.*

No. 3:20-cv-1775 (VAB)

**RULING AND ORDER ON MOTION FOR RECONSIDERATION**

On November 25, 2020, the Connecticut Fair Housing Center sued the United States Department of Housing and Urban Development ("HUD" or "Defendant") for release of records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, in relation to requested information regarding HUD's non-judicial foreclosure practices. *See* Compl., ECF No. 1 (Nov. 25, 2020).

Following voluntary settlement of this case, *see* Stipulation of Dismissal, ECF No. 21 (Apr. 11, 2022), Connecticut Fair Housing Center moved for attorney's fees and costs, *see* Pl.'s Mot. for Att'y's Fees and Costs, ECF No. 23 (Apr. 19, 2022), which the Court denied on July 1, 2022, *see* Order, ECF No. 30 ("Attorney's Fees Order").

On July 8, 2022, Connecticut Fair Housing Center moved for reconsideration of the Court's decision. *See* Mot. for Reconsideration, ECF No. 31 ("Mot. for Reconsideration").

For the following reasons, the motion for reconsideration is **GRANTED**.

On reconsideration, the motion for attorney's fees is **DENIED**.

1

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

On November 25, 2020, Connecticut Fair Housing Center sued HUD to obtain the release of records responsive to a FOIA request dated June 30, 2020. *See* Compl., ECF No. 1.

On January 8, 2021, HUD filed an Answer, asserting affirmative defenses in response to the allegations in the Complaint. *See* Answer, ECF No. 9.

Approximately a year later, following three status reports to the Court, *see, e.g.*, Joint Status Report, ECF No. 13, the parties reported that HUD had provided all responsive information to the FOIA request, *see* Third Joint Status Report, ECF No. 17. In light of this information, the Court administratively closed the case, granting leave to the parties to submit a stipulation of dismissal or a move to reopen the case by March 11, 2022. *See* Order, ECF No. 18.

On April 12, 2022, following a motion for extension of time granted by the Court, *see* Order, ECF No. 20, Connecticut Fair Housing Center filed a stipulation of dismissal, *see* Stipulation of Dismissal, ECF No. 21. In accordance with the parties' stipulation, the Court dismissed the action with prejudice. *See* Order, ECF No. 22.

On April 19, 2022, Plaintiff filed a motion for attorney's fees and costs. *See* Mem. of Law in Supp. of Mot. for Att'y's Fees and Costs, ECF No. 23-1 ("Mot. for Att'y's Fees"). Defendant objected to this request. *See* Def. Obj. to Mot. for Att'y's Fees and Costs, ECF No. 24 ("Obj. to Mot. for Att'y's Fees").

On May 24, 2022, Plaintiff filed a reply in further support of its motion for fees and costs. *See* Pl.'s Reply to Obj. of Def. to Pl.'s Mot. for Att'y's Fees and Costs, ECF No. 25 ("Reply in Supp. of Mot. for Att'y's Fees").

On June 30, 2022, the Court held oral argument on the motion for attorney's fees and costs. *See* Min. Entry, ECF No. 29.

On July 1, 2022, the Court issued an order denying the motion for costs and fees. *See* Attorney's Fees Order.

On July 8, 2022, Connecticut Fair Housing Center filed a motion for reconsideration of that denial. *See* Mot. for Reconsideration

On July 29, 2022, HUD filed a response to the motion for reconsideration. *See* Resp. to Mot. for Reconsideration, ECF No. 32 ("Opp'n to Mot. for Reconsideration").

## II.   STANDARD OF REVIEW

"The standard for granting [a motion for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (citations omitted). Indeed, "[m]otions for reconsideration shall not be routinely filed and shall satisfy the strict standard applicable to such motions." D. Conn. L. Civ. R. 7(c); *see also Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 108 (2d Cir. 2013) ("It is well-settled that a party may move for reconsideration and obtain relief only when the defendant identifies 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

"Reconsideration is not intended for the court to reexamine a decision or the party to reframe a failed motion." *Fan v. United States*, 710 F. App'x 23, 24 (2d Cir. 2018) (citing *Questrom v. Federated Dep't Stores, Inc.*, 192 F.R.D. 128, 130 (S.D.N.Y. 2000)). "A motion for reconsideration is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Mandell v.*

*Doloff*, No. 3:17-cv-01282-MPS, 2018 WL 3677895, at *1 (D. Conn. Aug. 2, 2018) (quoting *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012), as amended (July 13, 2012) (internal citation and quotation marks omitted)); *accord Shrader*, 70 F.3d at 257 ("[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided.").

### III.  DISCUSSION

#### A.  Motion for Reconsideration

##### 1.  Timeliness

In its prior order, the Court stated in a footnote that Connecticut Fair Housing Center "likely lack[ed] a basis to obtain attorney's costs and fees where, in contrast to the plaintiff in *Needletrades*, the Connecticut Fair Housing Center has not argued that it expressly reserved its ability to pursue attorney's fees post-settlement or otherwise moved to reopen this case, which has been administratively closed." Attorney's Fees Order at 4 n.1 (citing *Union of Needletrades, Industrial and Textile Employees v. INS*, 336 F.3d 200, 206 (2d Cir. 2003)).

Connecticut Fair Housing Center argues there is no statutory or case law basis to require a party to expressly reserve its rights to move for attorney's fees after judgment is entered and that the Court should not rely on *Needletrades* to create such a requirement. *See* Mot. for Reconsideration at 3–4. Connecticut Fair Housing Center states that motions for attorney's fees are typically heard post-judgment rather than after administrative closure of the case. *Id.* at 3. Connecticut Fair Housing Center further argues that administrative closure is not a judgment that would trigger the 14-day deadline to move for attorney's fees and, in Connecticut Fair Housing Center's view, "[r]equiring plaintiffs to move to re-open cases in order to move for fees would be an unnecessary addition of motion practice to the court's workload." *Id.* at 3–4. Finally,

4

Connecticut Fair Housing Center argues that if the Court wanted it to "seek fees within a certain period after receiving a report that the sought-after documents have been produced, it could enter a judgment of dismissal rather than administratively close the case." *Id.*

In response, HUD argues that Connecticut Fair Housing Center's argument "ignores the terms of the Court's February 13 Order." Opp'n to Mot. for Reconsideration at 2. More specifically, HUD argues that, in its order administratively closing the case, the Court modified the Federal Rule of Civil Procedure 54(d)(2) deadline when it ordered that "by March 11, 2022, the parties shall file a stipulation of dismissal *or* a motion to reopen the case, *to the extent further action is required*." *Id.* at 1 (emphasis in original). HUD emphasizes that this order, and the Court's subsequent order extending the deadline to April 11, were both issued in response to the parties' joint submissions that stated the only remaining issue was attorney's fees. *Id.* HUD argues that when Connecticut Fair Housing Center unilaterally stipulated to dismiss the claims with prejudice, it confirmed that no further action was needed from the Court. *Id.* Therefore, in HUD's view, Connecticut Fair Housing Center's deadline to move for attorney's fees was April 11 and therefore, its motion for attorney's fees, which was filed on April 19, was untimely. *Id.* at 3.

HUD also argues that the Court did not impose a "formalistic" reservation of rights requirement on all FOIA plaintiffs, but instead, "the Court ordered a deadline for further action that required nothing more than a motion to reopen if Plaintiff wanted to pursue attorney's fees." *Id.* Finally, HUD argues that requiring plaintiffs to move to reopen cases to move for fees would not unnecessarily add to the Court's workload because Connecticut Fair Housing Center "could have moved to reopen with a one-paragraph motion stating it sought further action on attorney's fees" and "simultaneously filed its Rule 54(d)(2) motion" for attorney's fees. *Id.*

The Court agrees in part and disagrees in part.

Under Federal Rule of Civil Procedure 54(d)(2)(B), a party moving for attorney's fees must do so within 14 days of judgment, "unless a statute or court order provides otherwise."

On February 11, 2022, the parties filed a joint status report in which they stated that "HUD provided plaintiff with the last category" of information responsive to the FOIA request. Third Joint Status Rep. at 1, ECF No. 17. The parties also informed the Court that they were "in the process of resolving the issue of attorney's fees and costs and request[ed] an additional 30 days to resolve the issue." *Id.* at 2. The parties stated that if the issue was resolved, they would file a stipulation of dismissal and if the issue was not resolved, "an appropriate motion [would] be filed with the Court." *Id.*

In response, on February 12, 2022, the Court issued an order stating that the parties appeared to have resolved the case and no longer needed relief from the Court. *See* Order, ECF No. 18 ("Based on the most recent status report, the last category of responsive information . . . has been provided, and no further relief from this Court may be necessary."). The Court also provided the parties with the thirty days they requested to resolve the issue of attorney's fees. *See id.* (allowing the parties thirty days to either "file a stipulation of dismissal or a motion to reopen the case, to the extent further action is required").

Rather than explicitly request further relief from the Court by filing a motion to re-open, Connecticut Fair Housing Center filed a stipulation of dismissal stating that it "stipulate[d] to dismiss all claims between the parties in this action, with prejudice."[1] Stip. of Dismissal, ECF No. 21. In response, the Court entered an order dismissing the case with prejudice. *See* Order,

---

[1] In the interim, the parties filed a joint motion for extension of the initial thirty-day deadline because they had "been working to resolve the issue of attorney's fees, however, more time [was] needed to reach a resolution." Joint Mot. for Extension, ECF No. 19. The Court extended the deadline an additional thirty days. *See* Order, ECF No. 20.

6

ECF No. 22. Connecticut Fair Housing Center did not file a motion to re-open or even a motion for attorney's fees before the April 11 court deadline, but instead filed its motion for attorney's fees within Rule 54's standard deadline.

In light of the unique circumstances of this case, particularly Connecticut Fair Housing Center's different understanding – arguably a misunderstanding – of the interplay between the Court's order administratively closing the case and Rule 54's standard 14-day deadline, and the lack of prejudice to HUD due to both parties' representation that the they had been actively discussing, but had not yet resolved the issue of attorney's fees, *see* Min. Entry, ECF No. 36, the Court will consider the motion for attorney's fees to be timely *nunc pro tunc*. *See Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) ("[D]istrict courts have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases."); *see also Smith v. Mikki More, LLC*, 59 F. Supp. 3d 595, 608 (S.D.N.Y. 2014) (finding "good cause to entertain plaintiffs' late-filed cross-motion" in part because "[t]here is no prejudice to defendants" and "plaintiffs have acted in good faith").

Accordingly, the Court will grant the motion for reconsideration on this ground.

### 2. The Court's Reliance on *Needletrades*

In its prior order, the Court denied Connecticut Fair Housing Center's motion for attorney's fees and costs because it found Connecticut Fair Housing Center was not eligible for attorney's fees. *See* Attorney's Fees Order at 4. The Court explicitly relied on *Needletrades* for the proposition that a plaintiff is not entitled to attorney's fees under FOIA because "the district court never granted any relief on the merits" and the parties never "requested that the district court order a consent decree or endorse, or retain jurisdiction over, a settlement agreement." 336 F.3d 200, 206 (2d Cir. 2003); *see also* Attorney's Fees Order at 3–4.

Connecticut Fair Housing Center argues the Court's reliance on *Needletrades* was an error because the Open Government Act of 2007 abrogated *Needletrades* and endorsed the "catalyst theory" of recovery as a theory under which plaintiffs can show that they "substantially prevailed." Mot. for Reconsideration at 2.

HUD agrees with Connecticut Fair Housing Center on this point. Opp'n to Mot. for Reconsideration at 3–4.

The Court also agrees.

In 2001, the Supreme Court rejected the "catalyst theory" as a permissible basis for the award of attorney's fees in certain categories of cases. *Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources*, 532 U.S. 598, 605 (2001). And following the reasoning in *Buckhannon*, the Second Circuit declined to apply the "catalyst theory" as a basis for attorney fee eligibility in FOIA cases, requiring instead a "judicially sanctioned change in the legal relationship of the parties." *Needletrades*, 336 F.3d at 208 (internal quotation marks omitted).

In 2007, however, Congress amended 5 U.S.C. § 552(a)(4)(E) in the OPEN Government Act of 2007, *see* Pub. L. No. 110-175, 121 Stat. 2524 (2007), and in *Warren v. Colvin*, the Second Circuit found that the OPEN Government Act "abrogate[d] the *Buckhannon* holding, as applied to FOIA actions." 744 F.3d 841 (2d Cir. 2014). Therefore, the Court's reliance on *Needletrades*, a case that expressly applied *Buckhannon* to the FOIA context, was in error. *See YLL Irrevocable Tr.*, 729 F.3d at 108 ("It is well-settled that a party may move for reconsideration and obtain relief only when the [party] identifies . . . the need to correct a clear error . . . .'").

As Connecticut Fair Housing Center has identified "the need to correct a clear error," *YLL Irrevocable Tr.*, 729 F.3d at 108, the Court will grant the motion for reconsideration on this ground.

Accordingly, the Court will now address the merits of the motion for attorney's fees.

### B. Motion for Attorney's Fees

FOIA provides that "[t]he court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). A litigant must show that he is eligible for an award of fees, that he is entitled to such an award, and that the requested attorney's fees are reasonable. *See New York Times v. Central Intelligence Agency*, 251 F. Supp. 3d 710, 713 (S.D.N.Y. 2017).

To establish eligibility, "a litigant must . . . show[] that he 'substantially prevailed' in his lawsuit." *Pietrangelo v. U.S. Army*, 568 F.3d 341, 343 (2d Cir. 2009). Under the catalyst theory, the litigant substantially prevailed if "the lawsuit was reasonably necessary and the litigation substantially caused the requested records to be released." *Schwartz v. U.S. D.E.A.*, No. 13 Civ. 5004 (CBA) (ST), 2019 WL 1299192, at *3 (E.D.N.Y. Mar. 1, 2019) (citing *Burka v. HHS*, 142 F.3d 1286, 1288 (D.C. Cir. 1998)), *report and recommendation adopted*, 2019 WL 1299660 (Mar. 21, 2019) The party requesting fees bears the burden "to establish that the litigation substantially caused the release of the requested records." *Ctr. for Pop. Dem. v. Bd. of Govs. of Fed. Reserve Sys.*, No. 16-cv-5829 (NGG) (VMNS), 2021 WL 4452202, at *5 (E.D.N.Y. Sept. 29, 2021).

In its initial motion for attorney's fees, Connecticut Fair Housing Center argued that it obtained a voluntary change in position from HUD because, before filing the Complaint, HUD

9

had not provided any documents responsive to the request that was the subject of this suit. *See* Mot. for Att'y's Fees at 4. After filing the Complaint, HUD produced "thousands of pages of material related to HECM foreclosures," which, in Connecticut Fair Housing Center's view, constitutes its "desired relief." *See id.*

HUD does not dispute that it did not produce the responsive documents until after this lawsuit was filed but argues that this alone is not sufficient to show that "the litigation substantially caused HUD to release the requested records." *See* Obj. to Mot. for Att'y's Fees at 6; Obj. to Mot. for Reconsideration at 6. HUD argues that it was diligently working to respond to Connecticut Fair Housing Center's FOIA request but had technical and cost-related difficulties doing so. *See id.* More specifically, HUD states that to produce the requested records, it would have had to ask the National Servicing Center to "create a special program . . . at a cost of $6,630." *See* Obj. to Mot. for Att'y's Fees at 6. HUD states that it "subsequently determined that responsive information could be [produced] . . . without the need for special programming or code," but that "the COVID-19 pandemic also caused delay." *See id.* at 7. HUD also stated that Connecticut Fair Housing Center "was informed of HUD's progress" throughout the litigation. *Id.* at 8.

HUD states that courts have found that a party did not substantially prevail if the "delay in the [document's] release was not due to intransigence, but rather was the result of a diligent ongoing process that began before the initiation of the instant lawsuit." *Id.* at 7 (quoting *Calypso Cargo Ltd. v. U.S. Coastguard*, 850 F. Supp. 2d 1, 5 (D.D.C. 2011)); Obj. to Mot. for Reconsideration at 6.

In response, Connecticut Fair Housing Center argues that it only needed to show that the "lawsuit was reasonably necessary to obtain requested information, and that the existence of the

lawsuit had a causa[l] effect upon the release of that information." Reply in Supp. of Mot. for Att'y's Fees at 2 (quoting *GMRI, Inc. v. EEOC*, 149 F.3d 449, 451–52 (6th Cir. 1998)). Connecticut Fair Housing Center argues that it had "no reasonable assurance that [HUD would] produce the requested material" because it had failed to provide an adequate response for several months. Reply in Supp. of Mot. for Att'y's Fees at 2. Therefore, in Connecticut Fair Housing Center's view, it was reasonable for it to believe that HUD would have only provided the requested information if it initiated a lawsuit. *Id.* at 3.

Connecticut Fair Housing Center also argues that courts "do not accept administrative delays as a *per se* reason to find that plaintiffs did not substantially prevail." *Id.* (citing *ACLU v. U.S. Dep't of Homeland Sec.*, 810 F. Supp. 2d 267, 274 (D.D.C. 2011)). To determine if the lawsuit had a causal effect, Connecticut Fair Housing Center urges the Court to consider whether the lawsuit "quicken[ed] the pace of agency disclosure." Reply in Supp. of Mot. for Att'y's Fees at 3 (first citing *Republic of New Afrika v. FBI*, 645 F. Supp. 117, 120 (D.D.C. 1986); and then citing *Terris, Pravlik & Millian, LLP v. Ctrs. for Medicare & Medicade Servs.*, 794 F. Supp. 2d 29, 38 (D.D.C. 2011)). Connecticut Fair Housing Center argues that this "quicken[ed] pace" may come in the form of simply negotiating in a "more expeditious manner." Reply in Supp. of Mot. for Att'y's Fees at 3 (quoting *Muffoletto v. Sessions*, 760 F. Supp. 268, 274 (E.D.N.Y. 1991)).

Finally, Connecticut Fair Housing Center argues that "even accepting HUD's explanation," HUD did not fully investigate its capacity to respond to the FOIA request until after the lawsuit was filed because HUD ultimately produced the documents "regardless of the coding issue" initially identified as the reason for delay. Reply in Supp. of Mot for Att'y's Fees at 4.

The Court disagrees.

Under the catalyst theory, "[t]he causation requirement is missing when disclosure results not from the suit but from delayed administrative proceedings." *Judicial Watch, Inc. v. U.S. Dep't of Just.*, 878 F. Supp. 2d 225, 232 (D.D.C. 2012). "If . . . an unavoidable delay accompanied by due diligence in the administrative process was the actual reason for the agency's failure to respond to a request, then it cannot be said that the complainant substantially prevailed in his suit." *Church of Scientology of Cal. v. Harris*, 653 F.2d 584, 588 (D.C. Cir. 1981). Administrative delay, however, that is unsubstantiated is insufficient. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 216, 233 (D.D.C. 2011) ("[A]lthough DHS alleges in its opposition that its failure to disclose non-exempt documents was due to 'backlog as well as administrative error,' . . . these generic statements—without any evidence demonstrating that a backlog existed or that the agency performed its due diligence in processing the plaintiff's FOIA requests—are insufficient.").

Courts "look at the circumstances surrounding disclosure[,]" *Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Just.*, 83 F.Supp.3d 297, 303 (D.D.C. 2015) *overruled on other grounds by Nat'l Sec. Counselors v. CIA*, 811 F.3d 22, 29 (D.C. Cir. 2016), and consider factors "such as whether the agency made a good[-]faith effort to search out material and pass on whether it should be disclosed, whether the scope of request caused delay in disclosure, and whether the agency was burdened by other duties that delayed its response[,]" *ACLU*, 810 F. Supp. 2d at 274 (internal quotation marks and citation omitted) (alteration in original); *see also Dorsen v. SEC*, 15 F. Supp. 3d 112, 118–19 (D.D.C. 2014) ("[A]n agency's delay in response . . . may be due to factors having nothing to do with the filing of the lawsuit but instead with administrative delays due to backlogs of FOIA requests, the volume of responsive records

requiring processing, the necessity of inter-agency searches and responses, or a combination of these factors.").

Analysis of an agency's claimed administrative delay is highly fact specific. *See Conservative Force v. Jewell*, 160 F. Supp. 3d 194, 205 (D.D.C. 2016). For example, in *Conservative Force*, the court found that the plaintiffs were not eligible for attorney's fees based on the agency's administrative delays. *Id.* at 206–07. There, the agency had a policy of reviewing documents in "sequential order" and had only one individual assigned to process all FOIA requests, in addition to that individual's various other non-FOIA-related duties. *Id.* at 206. The court noted that "[t]his dynamic alone could be the cause of intractable delays in responding to FOIA requests." *Id.* The agency, however, had additional difficulties. *Id.* The agency began to process the FOIA request before the lawsuit was filed, but the agency was delayed in August of 2012 when it "mistakenly decided to refer the request to the Department of the Interior for processing." *Id.* The agency did not correct the mistake until November 2012, which was one month after the lawsuit was filed. *Id.* The court concluded that, in light of the agency's administrative delays, the plaintiffs did not bear their burden to show that the lawsuit caused the agency to produce the requested documents. *Id.* at 207.

Conversely, in *Electronic Privacy Information Center v. U.S. Department of Homeland Security* (*EPIC II*), the court found that the lawsuit substantially caused the Department of Homeland Security to produce the responsive records. 218 F. Supp. 3d 27, 43 (D.D.C. 2016). The court found it significant that the agency "acknowledged receipt of [the plaintiff's] FOIA request" but "did not make a 'determination'" about whether to respond until after the lawsuit was filed and therefore, the agency's "delays suggest that it was not diligently responding to [the plaintiff's] request." *Id.* at 42. The court further reasoned that, while the Department of

13

Homeland Security had had "internal conversations about the request," it had not taken any affirmative steps toward searching for or producing documents prior to the lawsuit. *Id.* Finally, the court found the Department of Homeland Security's "backlogs and administrative difficulties" insufficient in part because the agency "failed to communicate these administrative hurdles . . . prior to the lawsuit or provide EPIC with any sort of timeline." *Id.* at 43.

Here, HUD began processing the request from the time of its receipt in June 2020 until September 2020, when HUD decided to put the "request on hold in light of the fee issue." *See* Decl. of Graham Mayfield ¶¶ 4–8, ECF No. 24-1 ("Mayfield Decl."). This period of action is substantiated by the Mayfield Declaration and includes actions such as forwarding the request to the National Servicing Center, which would have the relevant records; discussing the request for a fee waiver with Connecticut Fair Housing Center; and creating a cost estimate for the potential "search" fees. *See id.* During this period, HUD determined that the request would require "[w]riting code to create a report" which, in its view, "would constitute creating a new 'record.'" Mayfield Decl. ¶ 6.

Between September 2020 and December 2020, HUD was not actively processing the request because, in HUD's view, the request was paused and implicated two legal questions: first, whether HUD had to produce the requested records if the request would require HUD to create the requested records, as FOIA "does not require the creation of records," *see e.g.*, *Long v. U.S. Imm. & Customs Enf.*, No. 1:17-cv-506 (BKS/TWD), 2022 WL 705493, at *4–6 (N.D.N.Y. Mar. 9, 2022); and second, whether a non-profit organization "must still pay standard fees for the search of the agency records absent a significant public benefit," *see* 5 U.S.C. § 552(a)(4)(A)(ii)(II)–(a)(4)(A)(iii). *See* Mayfield Decl. ¶¶ 8–12; Opp'n to Mot. for Reconsideration at 8–9.

14

After December 2020, after the Complaint was filed, HUD identified an alternative solution and determined that "the response to [Connecticut Fair Housing's] FOIA request had been outstanding so long that [HUD] decided to find and produce the records, regardless of the record-creation issue." *Id.* ¶ 12. "[T]he FOIA branch [also] informed [HUD] that [HUD] could no longer charge search fees because of the delay in processing." *Id.*

In addition to the above delays, between June 2020 and May 2021 when HUD produce the first set of responsive documents, HUD stated that the COVID-19 pandemic impacted its ability to respond in a timely manner. *Id.* ¶ 14 More specifically, due to COVID-19, HUD had to "devote its resources toward quickly implementing new protections for single-family borrowers, and ensuring that servicers implemented loss mitigation tools to avoid foreclosure and adhered to the foreclosure moratoria." *Id.* In light of this, HUD had fewer resources to devote to resolving the issues with Connecticut Fair Housing Center's FOIA request. *Id.*

Finally, there is nothing in the record to suggest that HUD ultimately found a solution faster than it would have if Connecticut Fair Housing Center had not filed its Complaint. *See* Min. Entry, ECF No. 36 (during the motion hearing, HUD counsel represented that it was unclear whether HUD produced records more quickly due to the lawsuit).

Overall, in light of HUD's shifting of resources during the height of the COVID-19 pandemic, HUD's diligence in its initial response to the request, and the legal questions presented by the request that ultimately led HUD to pause its response for a few months before identifying an alternative solution, it is not clear that Connecticut Fair Housing Center's Complaint caused a "sudden acceleration," *EPIC II*, 218 F. Supp. 3d at 41, or "quicken[ed] the pace" of HUD's disclosure, *Republic of New Afrika v. FBI*, 645 F. Supp. 117, 120 (D.D.C. 1986); *see also Ctr. for Pop. Dem.*, 2021 WL 4452202, at *4 (finding that the plaintiff was not

eligible for attorney's fees where it "filed its lawsuit only two months after its [records r]equest," the agency "made its first production only three months after the [records r]equest," and the agency "provided sworn statements that its search-and-review process commenced when [the plaintiff's] request was received . . . and that the search was well underway").

Without any other facts in the record to suggest that the lawsuit caused HUD to respond more quickly[2], "the mere filing of the complaint and the subsequent release of the documents is insufficient to establish causation." *Schwartz v. U.S. Drug Enf. Admin.*, No. 13-CV-5004 (CBA) (ST), 2019 WL 1299192, at *4 (E.D.N.Y. Mar. 1, 2019) *report and recommendation adopted by* 2019 WL 1299660 (E.D.N.Y. Mar. 21, 2019) (quoting *Judicial Watch, Inc. v. U.S. Dep't of Just.*, 878 F. Supp. 2d 225, 231–32 (D.D.C. 2012)). Therefore, Connecticut Fair Housing Center has

---

[2] At oral argument, Connecticut Fair Housing Center offered to supplement the record further. The critical factual issues, however, already have been in the record for some time without a more specific response from Connecticut Fair Housing Center, and include the record search activity between June 2020, when the record request was first made, and December 2020, right after the lawsuit's filing. Between June 2020 until September 2020, there is no question that HUD began working on the record request, Mayfield Decl. ¶¶ 4–8; *see also* Reply in Supp. of Mot. for Att'y's Fees at 3–4 (relying on the facts in the Mayfield Declaration), leaving at issue only the time period between September 2020 and after the HUD became aware of the lawsuit in December 2020, as lacking substantial activity that this lawsuit could have "accelerated." *See* Reply in Supp. of Mot. for Att'y's Fees at 3–4 (arguing the lack of activity during this time period, followed by HUD's actions after the lawsuit began, constituted the necessary causal connection). But during this time period, HUD's further record searching was delayed by two legal issues, *see* Mayfield Decl. ¶¶ 6–8; Opp'n to Mot. for Reconsideration at 8–9, as well as complicated by administrative challenges related to the COVID-19 pandemic, *see* Mayfield Decl. ¶ 14. Even though HUD later produced the documents, despite these legal issues and even in the midst of continuing challenges during the COVID-19 pandemic, these factors were legitimate ones affecting HUD's response time before the lawsuit. *Cf. Ctr. for Pop. Dem.*, 2021 WL 4452202, at *19 (recognizing that, even if a lawsuit substantially caused the agency to act, courts still consider, *inter alia*, "whether the agency's opposition to disclosure had a reasonable basis in law, and whether the agency had been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior"). Yet, Connecticut Fair Housing Center did not argue in any of its briefing or at oral argument that either the legal issues or the impact of COVID-19 lacked merit, or otherwise should not be considered as part of the causation analysis here. Thus, it is not clear why or how any additional information or argument would change the record. In the absence of such specific information or a more precise argument as to how the record would change, the Court respectfully declines this invitation. *See Gordon v. Kaleida Health*, No. 08-CV-378S(F), 2013 WL 2250506, at *20 (W.D.N.Y. May 21, 2013) (declining the defendants' offer to provide additional evidence to support their burden on a fully brief motion in part because the defendants "failed to provide any indication as to the nature of the proposed supplemental material" and "[s]uch ambiguity makes it difficult to know whether [the d]efendants' proffered information would even be relevant to the specific issues raised on the instant motion"); *see also Sharbat v. Muskat*, No. 17-CV-4776 (KAM) (CLP), 2018 WL 463969, at *9 n.3 (E.D.N.Y. Sept. 27, 2018) (declining to "afford the petitioner the opportunity to supplement the record" to address certain other claims because "nothing in the . . . petitioner's briefing indicates that petitioner has any particular interest in" addressing those other claims).

not met its burden of showing that its lawsuit "more probabl[y] than not," *Conservation Force*, 160 F. Supp. 3d at 202, caused HUD's disclosure.

Accordingly, Connecticut Fair Housing Center is not eligible for attorney's fees, and, upon reconsideration, the Court will deny its motion for attorney's fees.[3]

### IV. CONCLUSION

For the reasons explained above, the motion for reconsideration is **GRANTED**.

On reconsideration, the motion for attorney's fees is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 13th day of January, 2023.

                        /s/ Victor A. Bolden
                        Victor A. Bolden
                        United States District Judge

---

[3] Because Connecticut Fair Housing Center is not eligible for attorney's fees, the Court will not address the entitlement and reasonableness issues.